## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KATHERINE CARDONA,

    *Plaintiff*,

    v.

WILLIMANTIC HOUSING AUTHORITY,

    *Defendant*.

No. 3:19-cv-00235 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

Katherine Cardona brings this action against the Willimantic Housing Authority ("the Housing Authority" or "WHA"), alleging that it discriminated against her and terminated her employment with WHA on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1]  ECF No. 31.  The Housing Authority has filed a motion for summary judgment.  ECF No. 33.  For the reasons set forth below, I GRANT that motion.

## I.  BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and are undisputed unless otherwise indicated.

The Willimantic Housing Authority manages low income housing units and a Housing Choice Voucher Program within the City of Willimantic.  ECF No. 40-1 ¶ 1.  Kim Haddad is the Executive Director for the Housing Authority and has held that position since August 2013.  *Id.* ¶

---

[1] Count Two of Cardona's operative complaint alleges that the Housing Authority discriminated against Cardona on the basis of disability in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12112.  ECF No. 31 at 1, 6.  But in her response to WHA's motion for summary judgment, Cardona states that she "is no longer pursuing her disability claim."  ECF No 40 at 1 n.1.  As a result, I need not address the Housing Authority's arguments regarding disability discrimination under the ADA and grant defendant's motion for summary judgment as to Count Two of the operative complaint.

2.  Prior to being appointed as the Executive Director, Haddad served as WHA's Assistant Director from May 1999 to August 2013 and as the Section 8 Specialist from September 1992 to May 1999.  *Id.*  Haddad is responsible for overseeing all day to day operations of the WHA.  *Id.*  The Housing Authority also has a Board of Commissioners consisting of five commissioners.  *Id.*  Haddad reports to the Board of Commissioners on an as needed basis (including regular monthly meetings) regarding WHA's operations.  *Id.*  Judy Smith is the Assistant Director of WHA.  *Id.* ¶ 4.  In this position, Smith is responsible for assisting the Executive Director in the overall administration of WHA.  *Id.*  She has held this position since July 2016; she was selected for the position by Haddad because of her extensive work experience at WHA and because she was the only person who applied for the position.  *Id.* ¶¶ 4, 13.[2]  The Housing Authority employs 24 employees – ten are Hispanic.  *Id.* ¶ 3; ECF No. 33-4 at 13-14.

Katherine Cardona, who is Hispanic, was hired by WHA as a Leasing Clerk in 2013. ECF No. 40-1 ¶ 5.  Her general duties were interviewing tenants, verifying income, calculating rents, and maintaining records; providing accurate information to tenants was a critical aspect of these duties.  *Id.*  She is a member of the Municipal Employees Union Independent, Local 506, SEIU, AFL-CIO ("Union").  *Id.* ¶ 3.  WHA and the Union entered into a Collective Bargaining Agreement covering the period July 1, 2016 – June 30, 2019 ("CBA").  *Id.*  The CBA contains a provision prohibiting discrimination based on race as well as other protected classes.  *Id.* ¶ 10. Haddad granted Cardona step increases to her hourly wage rate in 2016, 2017, and 2018 based

---

[2] Cardona admits only that Smith was appointed to the Assistant Director position, but states that she has no personal knowledge of the reasons for Smith's appointment. ECF No. 40-1 ¶ 13. Because paragraph 13 of WHA's Local Rule 56(a)1 Statement is supported by Haddad's affidavit, and because Cardona does not contest paragraph 13, I deem it admitted for the purpose of this summary judgment motion. *See* D. Conn. L. Civ. R. 56(a)1 ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact.").

on her prior year's job performance. *Id.* ¶ 6. She identified Cardona as having a "good job performance" in 2016 and a "great job performance" in 2017 and 2018. *Id.* Prior to October 2017, Cardona had "no issues" with Haddad. *Id.* ¶ 8.

In October 2015, a leasing clerk position became available at the Housing Authority. *Id.* ¶ 18. The previous employee holding that position provided leasing clerk duties for Section 8 tenants. *Id.* In 2016, Haddad promoted Miriam Torres, who is Hispanic, from her receptionist position to the vacant leasing clerk position. *Id.* ¶¶ 18-20; ECF No. 33-4 at 13.[3] Haddad assigned to Torres responsibility as leasing clerk for the public housing program – Cardona's prior responsibility – and reassigned Cardona to handle the Section 8 leasing clerk duties. ECF No. 40-1 ¶ 21.[4] Torres is the niece of Nelida (Beltran) Figueroa who was, at the time of Torres'

---

[3] In Cardona's Local Rule 56(a) statement, she admits that the leasing clerk position eventually filled by Torres became available in October 2015 and that Torres was not hired for the leasing clerk position until at least approximately one year later. ECF No. 40-1 ¶ 18. That timeline is consistent with Haddad's affidavit and attachment, both of which support the notion that Torres was hired as a leasing clerk in 2016, *see* ECF No. 33-4 ¶ 14; *id.* at 13, as well as the affidavit of Judy Smith, *see* ECF No. 33-5 ¶ 11. But in Cardona's Local Rule 56(a) statement of additional material facts, she states that Haddad reassigned the Section 8 leasing clerk duties to Cardona in October *2017*. ECF No. 40-1 at 18 ¶ 3 (citing to Cardona's affidavit). And at one point in her deposition, Cardona testified that she was moved to the Section 8 position in retaliation for her complaints about the English-only policy. ECF No. 33-7 at 42-44. Nonetheless, because Cardona has made no retaliation claim in this case, whether this reassignment of duties occurred in 2016 or 2017 is not material to the disposition of the Housing Authority's summary judgment motion.

[4] In Cardona's Local Rule 56(a)2 statement, she denies paragraph 21 in its entirety. *See* ECF No. 40-1 ¶ 21. But because the Housing Authority provides a specific citation to admissible evidence to support this fact (Haddad's affidavit, ECF No. 33-4 ¶ 15), and because Cardona provides no citation at all supporting her denial, I deem paragraph 21 admitted for the purposes of this summary judgment motion. *See* D. Conn. L. Civ. R. 56(a)(2)(i) ("A party opposing a motion for summary judgment shall file and serve with the opposition papers a document entitled 'Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment,' which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c). . . . All admissions and denials shall be binding solely for purposes of the motion unless otherwise specified. All denials must meet the requirements of Local Rule 56(a)3. . . ."); *id.* 56(a)(3) ("Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial. . . . Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law.").

promotion, WHA's Section 8 Specialist – a position with direct oversight over the Section 8 leasing clerk.  ECF No. 40-1 ¶ 20.  According to Haddad, she reassigned the Section 8 leasing clerk responsibilities to Cardona to avoid a potential conflict of interest posed by Torres and Figueroa's family relationship.  *Id.* ¶ 21.[5]  Haddad also reassigned Section 8 leasing clerk duties to Cardona – and assigned public housing leasing clerk duties to Torres – to help avoid conflicts that might arise between Cardona and her or her husband's relatives, friends, or other individuals who lived in public housing.  *Id.* ¶ 22.[6]  No such potential conflicts would exist as a result of Cardona being responsible for the Section 8 properties.  *Id.*  In addition, Haddad believed that it would be helpful to have Cardona responsible for the Section 8 properties because then she would have experience with both the Section 8 and the public housing properties, which would provide WHA with additional flexibility in the future.  *Id.* ¶ 23.[7]  Cardona suffered no loss of compensation or benefits from being reassigned to the Section 8 residents, *id.* ¶ 24, never complained to Haddad about the reassignment, *id.* ¶ 25, and never filed a grievance under the Union's collective bargaining agreement contesting the decision, *id.* ¶ 26.

On March 21, 2017, Haddad held a meeting with office staff in which she discussed, among other issues, speaking Spanish during working hours.  *Id.* ¶ 14.  Specifically, Haddad told the staff that they should speak English during working hours, unless they were speaking to, or interpreting for, Spanish-speaking tenants or for other business needs.  *Id.* ¶ 15.  Staff could speak Spanish during breaks or other non-work times.  *Id.*  Haddad made this decision because

---

[5] *See* note 4, *supra.*

[6] As with paragraph 21, Cardona denies paragraph 22 in its entirety but does not cite any evidence in support of the denial.  ECF No. 40-1 ¶ 22.  As a result, and because paragraph 22 is supported by Haddad's affidavit, ECF No. 33-4 ¶ 18, and Cardona's deposition, ECF No. 33-7 at 67-70, I deem paragraph 22 admitted for the purposes of WHA's summary judgment motion under Local Rule 56(a)3.  *See supra* note 4.

[7] Again, Cardona denies paragraph 23 in its entirety but cites no evidence in support of the denial.  ECF No. 40-1 ¶ 23.  As a result, and because paragraph 23 is supported by Haddad's affidavit, ECF No. 33-4 ¶ 17, I deem paragraph 23 admitted for the purposes of this summary judgment motion under Local Rule 56(a)3.  *See supra* note 4.

office employees who spoke only English had expressed that they often felt uncomfortable when employees spoke Spanish to each other during working hours, and because neither Haddad nor Smith could speak Spanish and therefore could not tell if the employees were being trained correctly. *Id.* ¶¶ 14-15.[8] Haddad also instructed staff that if one of them ever had concerns about the nature or type of conversation that was taking place between other co-workers, the concerned co-worker could say the word "cashews" to signal that the employee was uncomfortable with the conversation; this included situations where the employees might be speaking Spanish with each other as well as inappropriate language, jokes, etc. *Id.* ¶ 17.[9] Cardona never complained to Smith about these restrictions on speaking Spanish in the office. *Id.* ¶ 16.

On February 20, 2018, Cardona called WHA's attendance line and indicated that she would not be able to go to work that day because of a family emergency. *Id.* ¶ 35. After receiving Cardona's message from the attendance line, Smith determined that Cardona did not have sufficient sick leave to cover all seven hours of her February 20, 2018 absence from work. *Id.* ¶ 36. Cardona had previously received a verbal warning from Smith because her absences exceeded her available sick time. *Id.* ¶ 34. Section Eight of Article 13, Leave Provisions, of the CBA provides, in relevant part: "[V]acation days may be used as sick days, but only if the employee provides the Executive Director with a doctor's note immediately upon return to work.

---

[8] Cardona denies this portion of paragraph 14, as well as the portion of paragraph 15 stating that the rule regarding the use of Spanish was made "in order to avoid their co-workers from feeling uncomfortable and for efficiency of operations". *See* ECF No. 40-1 ¶¶ 14-15. But Cardona cites no evidence in support of her denial and because paragraphs 14 and 15 are supported by the affidavits of Haddad, ECF No. 33-4 ¶¶ 21-22, and Smith, ECF No. 33-5 ¶¶ 7-8, I deem both paragraphs admitted for the purposes of this summary judgment motion under Local Rule 56(a)3. *See supra* note 4.

[9] Cardona objects to this paragraph in that it "mischaracterizes the use of the word 'cashews'" because "[i]t was a word uttered only by Ms. Haddad to get employees to stop talking in Spanish or to stop talking at all." ECF No. 40-1 ¶ 17. But, again, Cardona cites no evidence in support of her denial and, because paragraph 17 is supported by Haddad's affidavit, ECF No. 33-4 ¶ 23, I deem this paragraph admitted for the purposes of this summary judgment motion under Local Rule 56(a)3. *See supra* note 4.

All other use of vacation time must be approved by the Executive Director in writing at least forty-eight (48) hours prior to use." *Id.* ¶ 33.  Employees are subject to discipline if they do not have sufficient accrued leave to cover their time off.  *Id.* ¶ 34.  As a result, Smith advised Cardona that she needed to obtain a doctor's note.  *Id.* ¶ 36.  Cardona responded to Smith's request by sending her an email on February 21, 2018 indicating that she would bring in a doctor's note.  *Id.* ¶ 37.  Cardona's email stated as follows:

> Hi Judy
>
> I will bring a doctor[']s note tomorrow.  I have a personal issue going on with me physically.  Yesterday was kind of an emergency for me to go see the doctor and I did.  I thought I had the time and didn't need the letter, so I will bring tomorrow.

*Id.*  Cardona later admitted during her deposition that she did not, in fact, see a doctor on February 20, 2018.  *Id.* ¶ 38.

On February 22, 2018, Cardona place a note from the Willimantic location of Generations Family Health Center ("Generations") in Smith's basket.  *Id.* ¶ 39.  The unsigned note listed "Dana Wiseman MD" as the "Primary Care Provider" and read as follows:

> Feb 20, 2018
>
> Re:   Katherine Cardona
>
> To Whom It May Concern:
>
> Katherine Cardona was seen in my office on 2/20/18 due to an Emergency Medical Visit.  Mrs. Cardona may return to work with no restrictions.
>
> Sincerely,
>
> Authorized by: Dana Wiseman MD on Feb 20, 2018 2:56 pm

*Id.*  Upon reviewing the February 20, 2018 note, Smith noted that it was unsigned and gave it to Haddad.  *Id.* ¶ 40.  Haddad had recently received doctors' notes from Generations that were

signed by the applicable physician or physician's assistant[10] and instructed Smith to contact

Generations to validate the note. *Id.* ¶¶ 41-42. On February 22, 2018, Smith spoke with Benjie

Rivera, the Willimantic Dental & Medical Practice Manager for Generations about the February

20, 2018 note, including the fact that it was unsigned. *Id.* ¶ 43. Rivera told her that Generations

could not validate the February 20, 2018 doctor's note; Rivera confirmed that "the letter given to

your staff member is not a valid letter that was given by our Provider" via email on February 26,

2018. *Id.*[11]

Smith then advised Haddad of the response she received from Rivera regarding the

February 20, 2018 doctor's note. *Id.* ¶ 44.[12] Haddad scheduled a pre-disciplinary meeting on

---

[10] Cardona denies paragraph 41 in its entirety but cites no evidence in support of the denial. As a result, and because paragraph 41 is supported by such a signed note, ECF No. 33-13 and Haddad's affidavit, ECF No. 33-4 ¶ 29, I deem paragraph 41 admitted for the purposes of this motion for summary judgment under Local Rule 56(a)3. *See supra* note 4.

[11] Cardona objects to paragraph 43 "on that basis that it is inadmissible hearsay." ECF No. 40-1 ¶ 43. WHA responds to this objection by stating that the information in paragraph 43 is confirmed by sworn testimony from Smith and that the conversation between Rivera and Smith is offered to prove what was said and its effect on Smith (and Haddad) – not for the *truth* of what was said. As a result, WHA argues that these conversations are not hearsay under Federal Rule of Evidence 801(c)(2). *See* ECF No. 41 at 10. I agree with WHA to the extent that Smith's testimony as to what Rivera said goes to its effect on Smith and, ultimately, Haddad, to whom Smith passed along the email and information from Rivera. ECF No. 33-5 at ¶¶ 30-31. Smith is plainly competent to testify to what Rivera said to her and, to the extent Rivera's statements are offered to show Smith's and Haddad's state of mind, her testimony as to her conversation with Rivera is not hearsay and is therefore admissible. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); *see also* 2 Robert P. Mosteller et al., McCormick On Evidence, § 246 (8th ed. 2020) ("[Rule 801(c)'s] definition means, therefore, that out-of-court conduct is not hearsay if . . . it is not offered to prove the truth of the matter asserted."); *id.* § 249 ("Utterances and writings offered to show effect on hearer or reader. A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as receiving notice or having knowledge or motive, or to show the information which X had as bearing on the reasonableness, good faith, or voluntariness of subsequent conduct, or on the anxiety produced.") (footnotes omitted). Further, evidence as to Smith's state of mind – and, by virtue of Smith's informing Haddad of Smith's conversation with and email from Rivera, Haddad's state of mind – is relevant to the extent it informs WHA's reasons for terminating Cardona's employment. Thus, Cardona's objection is overruled. It is also waived because it was not discussed in Cardona's memorandum of law. D. Conn. L. Civ. R. 56(a)2 ("A party shall be deemed to have waived any argument in support of an objection that such party does not include in its memorandum of law.").

[12] Cardona objects to paragraph 44 on the grounds that it is inadmissible hearsay. ECF No. 40-1 ¶ 44. But, as the Housing Authority points out, ECF No. 41 at 10, paragraph 44 involves actions taken by Smith (supported by sworn testimony from Smith, ECF No. 33-5 ¶ 31) after receiving Rivera's response and is therefore not hearsay. *See supra* note 11. Cardona's objection is therefore overruled.

February 28, 2018 – later rescheduled to occur on March 5, 2018 – with Cardona and her Union representative, Theo Horesco, to discuss the situation.  *Id.* ¶¶ 45, 56.  Haddad prepared a letter dated February 28, 2018, which she provided to Cardona and Horesco,[13] outlining her concerns about the February 20, 2018 doctor's note.  *Id.*  On March 1, 2018, Haddad received a two-page fax from Generations.  The first page of the fax was from Generations but did not indicate who specifically had sent the fax.  *Id.* ¶ 48.  The fax was addressed to Haddad "Re: Katherine Cardona."  *Id.*  The second page of the fax appeared to be the same February 20, 2018 doctor's note that Cardona had previously given to Smith except that the faxed letter had a fax number and other information on top.  *Id.* ¶ 49.  After receiving the fax from Generations, Haddad went to the Generations office to verify that the fax had been sent from that location and was informed that it had been but that Generations could not validate the February 20, 2018 letter because it had no record of Dr. Wiseman or any other physician having spoken to or seen Cardona that day.  *Id.* ¶ 52.[14]

---

[13] In her Local Rule 56(a) statement Cardona objects to paragraphs 46, 47, 50, 53, and the second sentence of 62 on the basis that they are inadmissible hearsay. ECF No. 40-1 ¶¶ 46, 47, 50, 53, 62.  But Cardona does not raise or discuss these objections at all in her memorandum of law.  *See* ECF No. 40.  Under Local Rule 56(a)2(i), "[a] party shall be deemed to have waived any argument in support of an objection that such party does not include in its memorandum of law."  D. Conn. L. Civ. R. 56(a)2(i).  As a result, Cardona has waived her objections to these paragraphs.  Nevertheless, in the interest of justice, I will not consider these paragraphs because they contain inadmissible hearsay.  In particular, each contains statements: (1) about communications between Haddad and Horesco; (2) that concern the pre-disciplinary hearing and the February 20, 2018 doctor's note; (3) that are supported only by Haddad's affidavit; and (4) that appear (at least in part) to be offered for the truth of what was said.  *Id.*  Further, while WHA responds to a number of Cardona's objections, *see* ECF No. 41 at 9-10, it is silent as to these specific objections.  Thus, I do not consider the statements in paragraphs 46, 47, 50, 53, and the second sentence of 62 in this ruling.

[14] Cardona objects to the entirety of paragraph 52 on the basis that it is inadmissible hearsay.  ECF No. 40-1 ¶ 52.  WHA responds by arguing that this paragraph is supported by the sworn testimony of Haddad about a conversation between her and a representative of Generations and that the conversation is offered to prove what was said and its effect on Haddad – not for the *truth* of what was said.  As a result, WHA argues that this conversation is not hearsay under Federal Rule of Evidence 801(c)(2).  *See* ECF No. 41 at 10.  I agree with WHA because Haddad's testimony as to what the Generations representative said about whether it could verify the fax goes to its effect on Haddad.  Haddad is plainly competent to testify as to her going to Generations and to what was said to her and, to the extent the statements of the Generations representative that Generations could not validate the February 20, 2018 note because it had no record of Cardona's being seen by a medical professional on that day are offered to show Haddad's state of mind, her testimony as to her conversation with the Generations representative is not hearsay and

Later in the day on March 1, Haddad asked Cardona to come to her office (Smith was also present). *Id.* ¶ 54. Haddad showed Cardona the February 20, 2018 letter that was attached to the fax and asked her if this was the letter that she intended to have Generations fax to Haddad. *Id.* ¶ 55. Cardona confirmed that it was. *Id.* Haddad noted that the February 20, 2018 faxed letter was unsigned and that Cardona would have to submit a signed doctor's note for her February 20, 2018 absence by close of business the next day, Friday, March 2, 2018 or the pre-disciplinary meeting with Cardona and Horesco would take place on Monday, March 5, 2018. *Id.* ¶ 56. Cardona understood that she needed to provide the doctor's note. *Id.*[15] During the March 1 meeting, Cardona never admitted that she was not seen by Dr. Wiseman on February 20, 2018 or that she had gone to Generations and left the facility before being seen by a doctor. *Id.* ¶ 57.[16]

On March 2, 2018, Cardona did go to see Dr. Wiseman but did not ask him or anyone else at Generations to sign a note excusing her from work on February 20, 2018. *Id.* ¶ 58. On March 4, 2018, Cardona sent Haddad an email in which she explained, for the first time, that she had gone to Generations on February 20, 2018 as a walk-in patient, that she waited there two hours to be seen, and that she started to feel sick and went home. *Id.* ¶ 59.[17] On Monday, March

---

is therefore admissible. *See* Fed. R. Evid. 801(c). In any case, Cardona admits that she was not seen by Dr. Wiseman or any other doctor on February 20, 2018, *see* ECF No. 40-1 ¶¶ 59, 61, and it follows that, because she was never seen by a doctor that day, Generations would not have any record of Cardona being seen by a doctor that day.

[15] Cardona denies this sentence of paragraph 56, but cites no evidence in support of the denial. As a result, and because that sentence is supported by Cardona's deposition transcript, *see* ECF No. 33-7 at 132 ("Q. So [Haddad and Smith] told you you need to get a signed note [during the March 1, 2018 meeting]. A. Yes. Q. So you walk out of that meeting knowing you need to get a signed note. A. Yes."), I deem that sentence of paragraph 56 admitted for the purposes of this summary judgment under Local Rule 56(a)3. *See supra* note 4.

[16] Cardona denies this paragraph in its entirety but cites no evidence in support of the denial. As a result, and because paragraph 57 is supported by Haddad's affidavit, ECF No. 33-4 ¶ 40, I deem paragraph 57 admitted for the purposes of this summary judgment motion under Local Rule 56(a)3. *See supra* note 4.

[17] Cardona denies this paragraph in the Local Rule statement to the extent it states that the March 4 email was the first time she told Haddad that she did not actually see a doctor on February 20, 2018. ECF No. 40-1 ¶ 59. But Cardona cites no evidence in support of her denial and, because that portion of paragraph 59 is supported by

5, 2018, Haddad conducted the pre-disciplinary meeting with Cardona; Smith and Horesco also attended the meeting.  *Id.* ¶ 60.

At the March 5, 2018 pre-disciplinary meeting, Haddad advised Cardona that she had provided false and inaccurate information by submitting the February 20, 2018 note from Generations which stated that she was seen by Dr. Wiseman even though Cardona knew that she had not actually seen Dr. Wiseman that day.  *Id.* ¶ 61.  Cardona never provided any note prepared by a doctor or physician's assistant to justify her February 20, 2018 absence from work. *Id.* ¶ 62.[18]  Cardona knew on February 21, 2018 when Smith asked her to bring in a doctor's note that she did not see Dr. Wiseman or any other physician or physician's assistant on February 20, 2018.  *Id.* ¶ 63.  Yet Cardona knowingly did not disclose to Smith or Haddad that she had not seen a physician on February 20, 2018 until March 4, 2018.  *Id.*[19]  At the conclusion of the March 5, 2018 pre-disciplinary meeting, Haddad verbally notified Cardona that she was being terminated from employment with WHA that day.  *Id.* ¶ 64.  Haddad sent Cardona a letter dated March 9, 2018 confirming Cardona's termination effective Monday, March 5, 2018.  *Id.* ¶ 65.  In this letter, Haddad outlined reasons for Cardona's termination which included that: (1) Cardona never submitted a signed doctor's note confirming that she was out of work on February 20, 2018 because she was sick; (2) Cardona knowingly submitted the February 20, 2018 letter from

---

Cardona's deposition transcript, ECF No. 33-7 at 143 ("[Q.] Is this [March 4, 2018 email] the first time now you're telling your employer that you were never seen by a doctor?  A. Yes.  Q. Okay. February 20.  A. Yes.  Q. Just so the record is clear.  So you had never mentioned this to anybody before?  A. No."), I deem that portion of paragraph 59 admitted for the purposes of this summary judgment motion under Local Rule 56(a)3.  *See supra* note 4.

[18] Cardona denies this sentence of the paragraph, but she cites no evidence in support of the denial.  As a result, and because that sentence is supported by Haddad's affidavit, *see* ECF No. 33-4 ¶¶ 44-45, I deem that sentence of paragraph 62 admitted for the purposes of this summary judgment motion under Local Rule 56(a)3.  *See supra* note 4.

[19] Cardona denies paragraph 63 in its entirety but cites no evidence supporting the denial.  ECF No. 40-1 ¶ 63.  As a result, and because paragraph 63 is supported by Cardona's deposition transcript, ECF No. 33-7 at 143, Haddad's affidavit, ECF No. 33-4 ¶ 46, and Smith's affidavit, ECF No. 33-5 ¶ 35, I deem paragraph 63 admitted for the purposes of this summary judgment motion under Local Rule 56(a)3.  *See supra* note 4.

Generations containing false information since she was never seen by Dr. Wiseman at Generations on February 20, 2018; and (3) despite having repeated opportunities to do so, Cardona never told representatives of WHA that she had not been examined by Dr. Wiseman or any other physician at Generations until her March 4, 2018 email. *Id.*

Cardona never filed any complaint about Haddad to the WHA Board of Commissioners. *Id.* ¶ 9. Cardona also never filed a grievance against Smith because of what she alleges was belittling, demeaning, and discriminating behavior, including allegations that Smith made fun of her accent. *Id.* ¶ 10.

Following her termination, Cardona applied for unemployment compensation benefits. *Id.* ¶ 66.[20] Before issuing its decision, the Employment Security Board of Review provided Cardona with the opportunity to submit a signed letter from Dr. Wiseman that he gave permission to the Generations receptionist "to generate medical documentation on February 20, 2018, indicating that the claimant [Cardona] was seen in the office and was released by him to return to work without restrictions." *Id.* Cardona never submitted the requested signed letter from Dr. Wiseman. *Id.*

On April 3, 2018, Haddad hired Katiana Nickle, who is Hispanic, for the leasing clerk position previously held by Cardona. *Id.* ¶ 67.[21] In addition, during Haddad's tenure as

---

[20] Cardona objects to paragraph 66 on the basis of relevance. ECF No 40-1 ¶ 66. But because she has not included this objection in her memorandum opposing summary judgment, Cardona has waived this argument under Local Rule 56(a)2(i). *See supra* note 13. In any case, the information contained in paragraph 66 is relevant to the extent that it: (1) tends to make the fact that Generations could not validate Cardona's February 20, 2018 doctor's note, and therefore that Cardona was unable to produce a version of that note signed by a doctor or physician's assistant from Generations, more probable; and (2) is a fact of consequence because WHA contends that it terminated Cardona's employment for knowingly submitting a fraudulent medical note. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

[21] Cardona objects to paragraph 67 on the basis of relevance and states that she "has no personal knowledge." ECF No. 40-1 ¶ 67. WHA responds to the objection by citing to cases from courts in the Second Circuit that find that the hiring of a replacement of someone from the same protected class as the plaintiff undermines or rebuts any inference of unlawful discrimination on the basis of that protected class. ECF No. 41 at 9. I agree with the Housing Authority

Executive Director, she promoted three Hispanic individuals.  As noted above, Torres was

promoted from receptionist to leasing clerk in 2016.  *Id.* ¶ 27.  In 2016, Haddad promoted

Marisely Jimenez, who is Hispanic, from the position of "Leasing Clerk" to "Senior Leasing

Clerk."  *Id.*  This promotion resulted in a pay increase to Jimenez and included her having some

supervisory and training responsibilities over WHA's leasing clerks.  *Id.*  In 2019, Haddad

promoted Edwin Maldonado, who is also Hispanic, to the position of Physical Plant Manager.

*Id.*[22]  Since being appointed as Executive Director in August 2013, Haddad has hired five

Hispanic employees at WHA.  *Id.* ¶ 69.[23]  Aside from Cardona, the only other WHA employee

terminated by Haddad during her tenure as Executive Director was Mark Maheu in 2016; Maheu

is White and worked as an inspector for WHA.  *Id.* ¶ 68.[24]

## II.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Tolan v.*

*Cotton*, 572 U.S. 650, 657-58 (2014) (internal quotation marks and citations omitted).  In

---

and, in any case, Cardona has waived this argument Local Rule 56(a)2(i), *see supra* note 13, because she did not include it in her memorandum opposing summary judgment.  Thus, I deem paragraph 67 admitted for the purposes of this summary judgment motion.  *See also* D. Conn. L. Civ. R. 56(a)1 & *supra* note 2.

[22] Cardona states that she has insufficient knowledge regarding Maldonado's promotion to respond.  ECF No. 40-1 ¶ 27.  As a result, and because that statement is supported by Haddad's affidavit, ECF No. 33-4 ¶ 5; *id.* at 14, I deem that portion of paragraph 27 admitted for the purposes of this summary judgment motion under Local Rule 56(a)1.  *See supra* note 2.

[23] Cardona denies this paragraph and states that Haddad hired only two Hispanic employees, but Cardona cites no evidence in support of her denial.  ECF No. 40-1 ¶ 69.  As a result, and because paragraph 69 is supported by Haddad's affidavit and supporting exhibit, ECF No. 33-4 ¶ 8; *id.* at 13-14, I deem paragraph 69 admitted for the purposes of this summary judgment motion under Local Rule 56(a)3.  *See supra* note 4.

[24] Cardona objects to this paragraph on the basis of relevance and denies that Maheu was white.  ECF No. 40-1 ¶ 68.  Rather, Cardona contends that Maheu is Hispanic but cites no evidence in support of her objection.  *Id.*  As a result, and because paragraph 68 is supported by Haddad's affidavit, ECF No. 33-4 ¶ 9, I deem paragraph 68 admitted for the purposes of this summary judgment motion under Local Rule 56(a)3.  *See supra* note 4.  As to relevance, WHA responds by arguing that evidence demonstrating that Haddad has terminated non-Hispanic as well as Hispanic employees assists in rebutting any inference of discrimination by Haddad.  I agree with WHA and, in any case, Cardona has waived this argument under Local Rule 56(a) by failing to include the objection in her memorandum opposing summary judgment.  *See supra* note 13.

reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III.   DISCUSSION

The Housing Authority has moved for summary judgment as to Cardona's race discrimination claim, arguing that: (1) Cardona cannot establish a prima facie case of race discrimination because she cannot meet her burden to demonstrate an inference of discrimination; (2) even if the court determines that Cardona has established a prima facie case, the Housing Authority has established a legitimate, non-discriminatory business reason for the termination of Cardona's employment, i.e., that she knowingly provided an unsigned doctor's note containing false information in connection with her February 20, 2018 absence from work; and (3) Cardona cannot prove that the Housing Authority's legitimate, non-discriminatory reason is a pretext for discrimination based on race. ECF No. 33 at 1-2. Cardona has responded by arguing that: (1) genuine issues of material fact exist as to whether the Housing Authority terminated Cardona's employment on the basis of race; and (2) the Housing Authority's reason – that she provided an unsigned and false doctor's note – is pretext. ECF No. 40 at 1. For the

reasons discussed below, I find that: (1) Cardona has not met her minimal burden to show that WHA terminated her employment "under circumstances giving rise to an inference of discriminatory intent", *Holcomb*, 521 F.3d at 138; (2) even if Cardona could meet this burden, the Housing Authority has met its burden of production to articulate a legitimate, non-discriminatory reason to terminate Cardona's employment; and (3) Cardona has failed to raise a genuine factual dispute about whether WHA's reason was pretextual or whether the decision to terminate her employment with WHA was based, even in part, on her race.  As a result, I must grant the Housing Authority's motion for summary judgment as to Cardona's race discrimination claim under Title VII.

### A.   Title VII of the Civil Rights Act of 1964

Title VII of the Civil Rights Act of 1964, as relevant here, provides that it is an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e–2(a)(1).  "[A]n unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e–2(m).  "An employment decision, then, violates Title VII when it is based in whole or *in part* on discrimination."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137-38 (2d Cir. 2008) (emphasis in original) (internal citations and quotation marks omitted).

Race discrimination claims under Title VII are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)*. See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  Under *McDonnell Douglas*, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Holcomb*, 521 F.3d at 138.  "[T]he showing the plaintiff must make as to the elements of the prima facie

case in order to defeat a motion for summary judgment is *de minimis*." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995) (internal quotation marks and citation omitted). To establish a prima facie case of race discrimination in violation of Title VII, the plaintiff must demonstrate that: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. In determining whether the plaintiff has met her *de minimis* initial burden of showing "circumstances giving rise to an inference of discrimination," "the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Cronin*, 46 F.3d at 204. "It is not the province of the summary judgment court itself to decide what inferences should be drawn." *Id.*

"If the plaintiff [establishes a prima facie case], the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." *Holcomb*, 521 F.3d at 138 (internal quotation marks omitted). Under the second prong of *McDonnell Douglas*, the defendant bears only a "burden of production", not persuasion. *Id.* at 141. "If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

In the Second Circuit, courts must use "caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb*, 521 F.3d at 137. "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (internal quotation marks omitted). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*; *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("Summary judgment is appropriate even in discrimination cases [because] . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." (internal quotation marks and citation omitted)). "To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138 (internal quotation marks omitted). If a plaintiff meets its burden to establish a prima facie case and the defendant satisfies its burden to demonstrate a legitimate, non-discriminatory reason, the plaintiff's ultimate burden of persuasion "may be carried by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence [or] it may often be carried by reliance on the evidence comprising the prima facie case, without more." *Cronin*, 46 F.3d at 203 (internal quotation marks and citations omitted).

## B.   Cardona Has Not Met Her *de minimis* Burden to Establish a Prima Facie Case of Race Discrimination under Title VII.

Here, it is undisputed that Cardona has met the first three prongs of a prima facie race discrimination claim under Title VII and *McDonnell Douglas*. Specifically, Cardona is a member of a protected class because she is Hispanic, she was qualified for her job as a leasing clerk, and she was subject to an adverse employment action when her employment with WHA was terminated. *See* ECF No. 40 at 8-9. The parties disagree as to the fourth prong of a prima facie case, i.e., whether Cardona has met her burden to show that "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. I agree with the Housing Authority and find that Cardona has not carried her burden to establish a prima facie race discrimination case.

To be sure, Cardona's burden to establish a prima facie case is "de minimis." *Cronin,* 46 F.3d at 203-04. Because "the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination of whether the circumstances give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994) (internal quotation marks and alteration omitted). While Cardona makes a number of general allegations of race discrimination,[25] she offers only the following specific allegations suggesting race discrimination: (1) "Haddad insisted that the Hispanic employees not speak Spanish at work

---

[25] In Cardona's operative complaint, she alleges that: (1) "Haddad immediately began discriminating against Plaintiff Katherine Cardona on the basis of her race …", ECF No. 31 ¶ 17; (2) "Haddad mistreated other Hispanics in the office …", *id.* ¶ 18; and (3) "Haddad targeted Hispanics to discriminate against", *id.* ¶ 19. But because, at the summary judgment stage, circumstances that give rise to an inference of discrimination must be based on admissible evidence, I consider only Cardona's specific allegations for which she provides evidence. *See Chambers*, 43 F.3d at 37-38. Her remaining allegations are the kind of "conclusory allegations" that cannot survive summary judgment. *See Holcomb*, 521 F.3d at 137.

even though there was no business justification for such a rule", ECF No. 40 at 1; (2) Haddad

"stated that she like[d] having Hispanics as employees because they always did exactly what she

told them to do", *id.*; (3) "Haddad would not promote Hispanic employees into a management

position, and, in fact, did not promote one Hispanic employee to a management position even

though the individual had seniority and was recognized as an excellent employee", *id.* at 1-2; and

(4) Smith "made fun of Ms. Cardona's Spanish accent", *id.* at 2.  I address each specific

allegation in turn and find that none are supported by "admissible evidence . . . sufficient to

permit a rational finder of fact to infer a discriminatory motive" in the decision to terminate

Cardona.  *Chambers*, 43 F.3d at 37-38.

     1.    *WHA's language policy is permissible and does not give rise to an inference of discriminatory intent.*

Cardona argues that there was no business justification for Haddad's policy regarding the

use of Spanish in the workplace because Cardona and "her three co-workers who were all

Hispanic and Spanish speaking worked in a separate office where the Caucasian workers did not

work" and because the policy made her and her Hispanic co-workers "sad and upset".  ECF No.

40 at 9; *see also* ECF No. 40-1 at 19-20 ¶¶ 7-9.  She also contends, without citing any authority,

that "[h]aving such a rule is itself a violation of Title VII."  ECF No. 40 at 9.  Because Cardona

fails to submit any evidence to suggest that the promulgation of WHA's language policy was

motivated by discriminatory animus, she cannot rely on this policy to establish an inference of

race discrimination.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993) ("As

part of a disparate treatment claim, the plaintiff must establish that the employer acted with the

intent to discriminate.").

Having an "English-only" rule in the workplace is not a per se violation of Title VII.  The

Equal Employment Opportunity Commission ("EEOC") – the agency responsible for, among

other duties, promulgating regulations under Title VII – has promulgated a regulation specifically addressing such a rule.  Under this regulation, while an English-only rule "applied at all times" in the workplace is "a burdensome term and condition of employment" that "the Commission will presume" violates Title VII, such a rule is permissible when "applied only at certain times" "where the employer can show that the rule is justified by business necessity." *See* 29 C.F.R. § 1606.7(a)-(b).  In addition, "if an employer believes it has a business necessity for a speak-English-only rule at certain times, the employer should inform its employees of the general circumstances when speaking only in English is required and of the consequences of violating the rule." *Id.* § 1606.7(c).  "If an employer fails to effectively notify its employees of the rule and makes an adverse employment decision against an individual based on a violation of the rule, the Commission will consider the employer's application of the rule as evidence of discrimination on the basis of national origin." *Id.*

Here, WHA's English-only policy in the workplace was applicable only at certain times, was justified by a business necessity, and was the subject of an adequate notice that Haddad provided to WHA staff.  As noted above, Haddad in March 2017 implemented a language policy – after announcing the policy and its rationale during a staff meeting – that required staff to speak English during working hours, unless they were speaking to, or interpreting for, Spanish speaking tenants or for other business needs.  ECF No. 40-1 ¶ 15.  Staff could also speak Spanish during breaks or other non-work times.  *Id.*  Haddad made this decision because office employees who spoke only English had expressed that they often felt uncomfortable when employees spoke Spanish to each other during working hours, and because neither Haddad nor Smith could speak Spanish and therefore could not tell if the employees were being trained correctly.  *Id.* ¶¶ 14-15.  As noted above, Cardona has failed to rebut this evidence.  *See* note 8,

*supra*.  While she does submit an affidavit averring that "Haddad and the other Caucasian employees rarely interacted with me or the other non-management Hispanic employees in our separate outer office," that "[e]ven . . . when we had no interaction with tenants, she insisted that we only speak English," and "[t]here were no Caucasians who complained about our speaking Spanish," ECF No. 40-2 ¶ 8, these averments do not, ultimately, contradict Haddad's own averments showing the business reasons for her adoption of the policy.  For example, Cardona does not suggest that speaking Spanish did not interfere with Haddad's and Smith's ability to monitor and ensure proper training.  And her statement that "no Caucasians . . . complained" is necessarily limited to her own personal knowledge, Fed. R. Civ. P. 56(c)(4), and does not contradict Haddad's averment that English-speaking-only employees did express concerns "when other employees were speaking Spanish because the non-Spanish employees did not know what they were saying."  ECF No. 33-4 at ¶ 21.  Cardona's averments – even if they had been properly presented in her Local Rule 56 statement as support for her denials of WHA's assertions about the business need for an English-only policy at certain times, *see* note 8, *supra* – thus are insufficient to raise a genuine dispute of material fact about WHA's business justification for requiring English-only at certain times.

Courts in the Second Circuit have consistently found that such language policies are permissible where, as here, the policy applied only at certain times, was justified by a business necessity, and involved work-related communications by bilingual employees.[26]  *See Pacheco v.*

---

[26] Some claims targeting this kind of English-only policy are brought under a "disparate impact" theory.  *See* 24 A.L.R. Fed. 2d 587.  Even if Cardona were to make a disparate impact claim based on WHA's language policy, it would fail on the record before me.  Disparate impact claims are evaluated under a burden-shifting framework that requires the plaintiff, in the third stage, "to establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect."  *See E.E.O.C. v. Sephora USA, LLC*, 419 F.Supp.2d 408, 413-14 (S.D.N.Y. 2005).  Even assuming Cardona could meet the first stage to show a prima facie disparate impact claim – and at least one court in the Second Circuit has suggested that the EEOC's regulation "assumes that the existence of [a 'certain times' English-only rule] satisfies an employee's

*New York Presbyterian Hosp.*, 593 F.Supp.2d 599, 613 (S.D.N.Y. 2009) ("Given the EEOC's position, it should not be surprising that Plaintiff has failed to identify a single case in which a court upheld a Title VII claim in the face of a summary judgment motion where the language policy involved work-related communications by bilingual employees and the policy was found to further a legitimate business purpose."); *Sephora USA, LLC*, 419 F. Supp. 2d at 415 ("Courts have found 'certain times'-type English-only rules permissible when they are justified by a need to stem hostility between bilingual employees speaking a foreign language and employees who do not speak that language, as well as when English-speaking supervisors need to understand what is being said in a work area." (collecting cases)).  In addition, Cardona has presented no evidence to suggest that any of the Spanish-speaking employees could not also speak English (i.e., that they were not bilingual) or that WHA or its management acted with any intent to discriminate when it promulgated its language policy.  As a result, Cardona has failed to demonstrate an inference of discrimination based on WHA's workplace language policy.

2. *The evidence of Haddad's alleged statement that she "liked having Hispanics as employees because they always did exactly what she told them to do" is inadmissible hearsay.*

Next, Cardona alleges that "Haddad stated that she liked having Hispanics to work for her because they did exactly what she told them to do," ECF No. 40-1 at 20 ¶ 15, and argues this "attitude to Hispanics was denigrating . . .", ECF No. 40 at 10.  The Housing Authority responds by pointing out that, according to Cardona's deposition, she never heard Haddad make this comment but only heard it attributed to Haddad by one of her co-workers, Kathy Light.  ECF No.

---

burden to establish a prima facie case of disparate impact", *see id.* at 414, WHA has met its burden in the second stage to show a business necessity and Cardona has provided no argument or evidence regarding the availability of any alternative policy or practice that would also satisfy the asserted business necessity without producing the disparate effect.

41 at 6.  As a result, WHA argues that Cardona's statement of what Light said is inadmissible

hearsay and thus cannot support an inference of discrimination.  I agree with the Housing

Authority.

> Cardona's deposition transcript, in relevant part, reads as follows:

> Cardona: Then Kathy Light, she was the union representative in the office, she told myself, Nellie and Maricelys, which is another employee there, that Kim was only hiring the Hispanics in the outer office, because the Hispanic girls always do what she says, what she asks of them without complaining.

> . . .

> Q. So this conversation you heard from Ms. Light?  I want to make sure I have it correctly.  So she told you -

> [Cardona]. Yes.

ECF No. 33-7 at 40; *see also id.* at 41-42 ("Q. Kathy said that [Haddad 'only hires Hispanics in

the outer office, because we do whatever she says, and as well, she will not put any Hispanic girl

in any manager position'] at the same -- [Cardona]. Yes. Q. -- time?  One time, that's the only

time she said that to you.  [Cardona]. Yes.").  Under Federal Rule of Evidence 801(c),

"'[h]earsay' means a statement that: (1) the declarant does not make while testifying at the

current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted

in the statement."  Fed. R. Evid. 801(c).  Kathy Light's statement about what Haddad said

satisfies the first prong, and because Cardona offers it to prove the truth of the matter asserted by

Light, i.e., that Haddad made the remark about when and why she would hire Hispanic women,

Light's out-of-court statement is inadmissible hearsay.  Because Cardona must present

admissible evidence sufficient to enable a rational factfinder to infer that Haddad harbored a

discriminatory motive, the statement that Cardona describes is only helpful to establishing a

prima facie race discrimination claim if Light's statement that Haddad made the remark is

actually true.  Thus, Cardona's statement that Light told her that Haddad made an allegedly

discriminatory remark is inadmissible hearsay.  Further, because Cardona presents no other

evidence in support her contention that Haddad stated that she "liked having Hispanics as

employees because they always did exactly what she told them to do" (or that Haddad made the

other statements Cardona testified that Light attributed to her, ECF No. 33-7 at 41), that

contention is not "admissible evidence show[ing] circumstances that would be sufficient to

permit a rational finder of fact to infer a discriminatory motive." *Chambers*, 43 F.3d at 38.

>    3.    *Haddad's record of promoting Caucasian and Hispanic individuals does not give rise to an inference of discrimination.*

Cardona argues that Haddad would not promote Hispanics to management positions in

general[27] and, in one particular instance, hired a Caucasian instead of a qualified Hispanic

person.  Specifically, Cardona argues that a rational factfinder could infer a discriminatory intent

because "Mariclys Jiminez[28] . . . should have been promoted to office manager and instead was

made senior housing clerk, a non-management position." ECF No. 40 at 4.  Cardona states that

"Jiminez was a young and smart Hispanic girl who[] had worked with the Willimantic Housing

Authority for 7 years.  She had seniority for the promotion and was regarded by all her peers as

an excellent employee." *Id.*  Instead, Judy Smith, who is Caucasian, was selected for the

position. *Id.*  The Housing Authority responds by arguing that Jimenez did not even apply for

the position filled by Smith and that Smith has worked for the Housing Authority for 32 years –

far longer than Jimenez.  *See* ECF No. 41 at 7; ECF No. 33-1 at 16-17.  In addition, WHA points

out that Haddad promoted three Hispanic individuals during her tenure (including Jimenez) and

---

[27] Cardona's only evidence for the general proposition appears to be the same hearsay statement of Kathy Light that I have found inadmissible. *See* ECF No. 33-7 at 41.

[28] Cardona and WHA appear to use different spellings ("Jiminez" versus "Jimenez") when referring to the Hispanic individual who Cardona alleges should have been selected to be WHA's Assistant Director instead of Smith.

that of the two individuals she fired, one was Hispanic while the other was Caucasian.  ECF No. 41 at 7.  Cardona has failed to offer evidence to rebut these facts, and I find that Haddad's record of promoting Caucasian and Hispanic individuals does not give rise to an inference of discrimination.

First, as to Smith's promotion to the position of Assistant Director, Cardona never alleges – let alone submits evidence – that Jimenez actually applied for the position and does not contest WHA's statement that Smith was the *only* person to apply for this position.  Cardona also does not explain how Jimenez had "seniority" for the position when Smith had more than *two decades* of additional experience at WHA compared with Jimenez.  On that record, there is no basis on which a reasonable factfinder could infer discriminatory intent.  Second, Haddad's record of promoting, hiring, and firing individuals, if anything, cuts *against* an inference of discriminatory intent.  That is so because, with a workforce of only 24 employees, she promoted three Hispanic individuals: Miriam Torres, from receptionist to leasing clerk in 2016, ECF No. 40-1 ¶ 27; Marisely Jimenez, from the position of leasing clerk to senior leasing clerk, *id.*; and Edwin Maldonado, to the position of Physical Plant Manager, *id.*  Haddad has also hired five Hispanic employees during her tenure as Executive Director, *see id.* ¶ 69, and fired only one – Cardona – and one Caucasian individual.  *Id.* ¶ 68.  Lastly, Haddad hired a Hispanic individual, Katiana Nickle, for the leasing clerk position previously held by Cardona.  *Id.* ¶ 67.  Taken together, Haddad's record of promoting, hiring, and firing undermines any inference of discriminatory intent.  *See Inguanzo v. Hous. & Servs., Inc.*, 621 F. App'x 91, 92 (2d Cir. 2015) (holding that plaintiff's "replacement by another Hispanic woman further undermines her race and gender claims").  Thus, a rational factfinder could not infer discriminatory intent on the basis of Haddad's record of promoting, hiring, or firing individuals at WHA.

      *4.     Smith's alleged comments regarding Cardona's accent, even if true, are stray remarks insufficient to infer discriminatory intent and bear no causal relationship to any adverse employment action.*

Lastly, Cardona argues that Smith "made fun of her accent and on numerous occasions corrected how the Plaintiff spoke". ECF No. 40 at 9. The Housing Authority responds by arguing that Cardona provides no admissible evidence to support this claim and that, in any case, she fails to explain how these comments relate to Haddad's decision to terminate Cardona's employment with WHA. ECF No. 41 at 7. I find that no rational factfinder could infer discriminatory intent in the termination decision on this basis.

In Cardona's deposition, she stated that, when Cardona was talking, Smith would say things like "Oh no, you say it like this" or she would laugh and correct Cardona, saying "Why do you say it like that?" ECF No. 33-7 at 82. Cardona then confirmed Smith did this around five times. *Id.* at 83 ("Q. So around five times she made fun of what you said and corrected it. [Cardona]. Right."). Comments like these, even if true, are insufficient to support an inference of discriminatory intent because they are stray remarks not made by the decision-maker and, on the record before me, bear no connection to Haddad's decision to terminate Cardona's employment with WHA. *See Hasemann v. United Parcel Serv. of Am., Inc.*, No. 11–CV–554, 2013 WL 696424, at *6 (D. Conn. Feb. 26, 2013) ("It is well established that 'the stray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination.' ") (quoting *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir. 2001)); *Almonord v. Kingsbrook Jewish Med. Ctr.*, No. 04–CV–4071, 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007) ("In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion.") (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)); *see also Ezold v. Wolf, Block, Schorr & Solis–*

*Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

Because Cardona has not established a prima facie case of race discrimination, I need not proceed further because her failure to clear this threshold is sufficient grounds to grant WHA's motion for summary judgment. Nevertheless, I now turn to the second and third prongs of *McDonnell Douglas* because, even if Cardona could meet her initial burden under the first prong, the Housing Authority has presented evidence sufficient to articulate a legitimate, non-discriminatory reason to terminate Cardona's employment. In addition, as to Cardona's burden under the third prong, she has not presented sufficient evidence from which a reasonable jury could conclude that WHA's proffered reason is pretextual or that WHA otherwise based its decision to terminate Cardona's employment on race, even in part. Thus, summary judgment in favor of the Housing Authority remains appropriate even if Cardona could establish a prima facie case of race discrimination on the record before me, as I discuss in greater detail below.

### C.    The WHA Has Articulated a Legitimate, Non-Discriminatory Reason for Terminating Cardona.

If Cardona could meet her initial burden under the first prong of *McDonnell Douglas*, the burden would shift to the Housing Authority to produce evidence sufficient to show that it terminated Cardona's employment "for a legitimate, nondiscriminatory reason." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At this stage, the court's task is to determine whether the defendant has introduced evidence that, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action", *St. Mary's Honor Center*, 509 U.S at 509 (emphasis in original); "the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can

involve no credibility assessment [by the court]", *id.* The Housing Authority has met its burden

by presenting admissible evidence that Cardona knowingly twice submitted a doctor's note that

contained false information to excuse her absence from work on February 20, 2018. *See* ECF

No. 33-1 at 22-27. Specifically, the Housing Authority has presented: (1) the affidavits of

Haddad and Smith, ECF Nos. 33-4, 33-5; (2) Cardona's deposition transcript, ECF No. 33-7; (3)

the original and faxed versions of the February 20, 2018 doctor's note, ECF Nos. 33-12, 33-16;

(4) an email from Generations to Smith indicating that Generations could not validate the

February 20, 2018 doctor's note, ECF No. 33-14; (5) a letter from Haddad to Cardona dated

February 28, 2018 about the pre-disciplinary meeting indicating that "disciplinary action,

including termination, is being considered" because of Cardona's "absence on February 20, 2018

and the documentation that was provided upon [her] return to work . . . could not be validated"

by Generations, ECF No. 33-15; (6) Cardona's email to Haddad dated March 4, 2018 in which

she explains that she did go to Generations on February 20, 2018 but was not evaluated by Dr.

Wiseman or any other medical professional, ECF No. 33-17; and (7) Haddad's letter to Cardona

dated March 9, 2018 in which she notifies Cardona that her employment with WHA is

terminated and explains that there is "just cause" for her termination based on her actions related

to the February 20, 2018 absence from work and the doctor's note containing "false

information", ECF No. 33-18. This evidence is sufficient to meet the Housing Authority's

burden of production to articulate a legitimate and non-discriminatory reason for terminating

Cardona's employment, namely that she "knowingly provided her employer (twice) with a

doctor's note containing false and inaccurate information in connection with her February 20

absence and [she] never submitted a signed doctor's note as instructed to by WHA confirming

that she was ill." ECF No. 41 at 2.

**D.      Cardona Has Failed to Introduce Evidence of Pretext or Discrimination.**

Because the Housing Authority has produced evidence that it acted for a non-discriminatory reason, Cardona "may no longer rely on the presumption of discrimination raised by the prima facie case," *Holcomb*, 521 F.3d at 141—to the extent any such presumption is raised at all in this case.  Under the third prong of *McDonnell Douglas*, I must ask "whether, without the aid of the presumption, [Cardona] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [her] was based, at least in part, on the fact that [she is Hispanic]." *Id.*  For the reasons discussed below, I find that no reasonable jury could so conclude based on the record before me.

Cardona argues that WHA's proffered reason for terminating her employment is pretextual because it "does not pass the straight-face test", relying on the Seventh Circuit case *Stalter v. Wal-Mart*, 195 F. 3d 285 (7th Cir. 1999).  In support of her argument, Cardona states that she and other WHA employees had "previously used such unsigned notes to explain their absences" without issue and that the Collective Bargaining Agreement does not require doctor's notes to be signed.  ECF No. 40 at 11.  In addition, Cardona argues that "the unsigned note was ambiguous and not clearly false", that she "was not the author of the note so she should not be blamed for any lack of veracity in the note", and that she "was a well-regarded employee and to be terminated rather than suffer a lesser form of discipline like a suspension or warning is out of proportion with her conduct . . . ." *Id.* at 11-12.  The Housing Authority responds by arguing that Cardona's conduct was more severe than failing to submit a signed doctor's note because she twice knowingly submitted false information to excuse her absence from work.  ECF No. 41 at 8.  As to whether Cardona's conduct justified termination, as opposed to suspension or a warning, WHA argues that that issue is not before the court because—without evidence tying the

termination decision to racial animus—whether termination is unfair or disproportionate is, standing alone, irrelevant to discrimination claims under Title VII.  I agree with the Housing Authority.

At this stage, Cardona must either present admissible evidence "from which a reasonable jury could infer that the legitimate, nondiscriminatory reason for discharge offered by [WHA] . . . was a pretext for discrimination[,]" *Sanchez v. Connecticut Nat. Gas Co.*, 421 F. App'x 33, 35 (2d Cir. 2011) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 515), or—if she is unable to show that WHA's reason was pretextual—"rel[y] on the evidence comprising the prima facie case, without more" to survive summary judgment and carry her ultimate burden of persuasion.  *Cronin*, 46 F.3d at 203.  I address each issue in turn.

As to pretext, Cardona has not presented any admissible evidence suggesting that Haddad did not actually believe that the February 20, 2018 doctor's note was false or that Cardona had misled Smith and Haddad.  Haddad's *belief*, i.e., the *reason* she decided to terminate Cardona's employment, is the key question in a race discrimination case.  The issue is *not* whether the doctor's note was actually false or whether requiring a signed doctor's note was a uniform practice of the WHA.  *See Ben-Levy v. Bloomberg. L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013) (affirming district court's grant of summary judgment on discrimination claim in favor defendant because, in part, the plaintiff "[did] not present evidence to suggest that his managers did not actually hold those [legitimate, non-discriminatory] beliefs about his abilities [—upon which the defendant relied to justify its adverse employment action—] nor does he offer evidence to undermine [those beliefs]." (collecting cases)); *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, . . . [courts in the Second Circuit are] interested in what *motivated* the employer; the factual validity of the underlying imputation

against the employee is not at issue." (emphasis in original) (internal quotation marks and citation omitted)).  Here, there is substantial evidence that Haddad did believe that the note was false—as discussed in detail above—and I am aware of no evidence to the contrary.  Indeed, there is strong evidence that the note was, in fact, false—or, at best for Cardona, "ambiguous," ECF No. 40 at 11, and misleading.[29]  As a result, no reasonable jury could conclude that WHA's proffered reason for terminating Cardona's employment was pretextual.

Cardona's reliance on *Stalter* does not alter this conclusion.  In *Stalter*, the Seventh Circuit reversed the district court's grant of summary judgment on a race discrimination claim in favor of the defendant because, in part, the plaintiff (who was African American) submitted sufficient admissible evidence to raise a genuine dispute of material fact as to the defendant's proffered race-neutral reason for firing the plaintiff—that "he stole a handful of taco chips from another employee[,]" *Stalter*, 195 F.3d at 286.  The plaintiff had eaten a few chips from an apparently abandoned open bag of chips in an employee common area and, when he realized the bag of chips belonged to another employee, the plaintiff apologized and offered to buy the owner a new bag of chips or cup of coffee.  *Id.*  The Seventh Circuit held that that circumstance, in combination with other circumstantial evidence, including that the alleged victim of the taco-chip theft considered it "no big deal" and that the defendant "treated a similarly situated Caucasian employee who committed a similar offense much more leniently", *id.* at 289-90, was

---

[29] In truth, it is difficult to see how the doctor's note is "ambiguous" and "not clearly false," as Cardona argues. ECF No. 40 at 11.  The note, supposedly authorized by Dr. Wiseman, stated that Cardona was "seen in my [(Dr. Wiseman's)] office on 2/20/18" and concluded that Cardona "may return to work with no restrictions."  ECF No. 40-1 ¶ 39.  If the note was actually intended to indicate that Cardona was merely "seen" in the sense that she argues, i.e., that someone at Generations saw her sitting in the waiting room but no medical professional evaluated her, then it is not clear how she could have been cleared to return to work with no restrictions or why she would have thought that such a note satisfied her employer's needs.  Indeed, Cardona admits that she was not seen by a medical professional that day and the note contains what is, on its face, a professional medical opinion about Cardona's health.  Given these facts, I do not see how any reasonable jury could conclude that the note was anything but false—even if that were the relevant question.

sufficient to raise a genuine dispute of material fact as to the defendant's motive for firing the plaintiff.  The circumstances in *Stalter* are easily distinguishable from those presented here, both because of the seriousness of the employee's conduct – submitting a fraudulent doctor's note to one's employer is more serious than purloining a few chips from a co-worker (conduct the *Stalter* court described as a "molehill," *Stalter*, 195 F.3d at 287) – and the circumstances, including the fact that in *Stalter* the Caucasian co-worker from whom the chips were "stolen" "did not care about the incident," *id.* at 288, and had herself been treated more leniently following her own more serious disciplinary violation.

As for Cardona's claim that termination was a sanction "out of proportion" to her conduct, it is irrelevant to a Title VII discrimination claim, absent evidence that non-Hispanic employees were treated more leniently for similar conduct.  Where, as here, there is insufficient evidence of intentional discrimination, whether an adverse employment action is "unfair or disproportionate" is insufficient under Title VII to survive summary judgment.  *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 939 (8th Cir. 2019).

Because Cardona has not presented evidence from which a reasonable jury could conclude that WHA's race-neutral reason for terminating her employment was pretextual, and because she offers no additional evidence to support her claim, she must rely on the evidence raised to establish her prima facie case.  As shown above, the admissible evidence proffered by Cardona is insufficient to establish a prima facie case, but even if it met that *de minimis* standard, the record before me is plainly insufficient to raise a genuine dispute as to any fact material to her race discrimination claim, even when all reasonable inferences are drawn in favor of Cardona.  For example, although, as explained above, I do not find any evidence in the record to suggest that WHA's language policy was discriminatory, the announcement of that policy was

also much farther removed from the decision to terminate Cardona's employment than Cardona's conduct related to the February 20, 2018 absence and doctor's note; almost an entire year passed between Haddad's announcement of that policy and the decision to terminate Cardona's employment.  In addition, in February 2018, just over one month prior to Haddad's decision to fire Cardona, Haddad gave Cardona a raise (as she did in 2016 and 2017) because of her "great job performance over the past year", ECF No. 40-1 ¶ 6, which undermines the suggestion that she bore any animus towards Cardona, racial or otherwise.  And, as noted, Haddad hired another Hispanic woman, Katiana Nickle, to fill Cardona's prior position just weeks after Cardona was fired, *id.* ¶ 67.  These facts, along with Haddad's overall record of hiring and firing, cut against any inference of discrimination, to the extent one exists here at all.  *See Nieves v. Avalonbay Communities, Inc.*, No. 306CV00198DJS, 2007 WL 2422281, at *11 (D. Conn. Aug. 23, 2007) ("[A] replacement within the same protected class cuts strongly against any inference of discrimination." (collecting cases)).  As a result, on the record before me, no reasonable jury could conclude that the Housing Authority's decision to terminate Cardona's employment was based, even in part, on her race.

\* \* \*

Thus, because (1) Cardona has not met her burden to show that her employment with WHA was terminated under circumstances giving rise to an inference of discrimination, and (2) even if she could establish a prima facie case, WHA has articulated a legitimate, non-discriminatory reason for terminating Cardona's employment, and Cardona has failed to raise a genuine dispute of material fact about whether WHA's reason was pretextual or whether its decision to terminate her employment was based on race, I grant summary judgment in favor of the Housing Authority as to Cardona's race discrimination claim.  *See Chambers*, 43 F.3d at 40

32

("Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." (internal quotation marks and citations omitted)).

## IV.     CONCLUSION

For the reasons set forth above, I hereby GRANT Defendant's motion for summary judgment (ECF No. 33).  The Clerk is directed to close this case.


IT IS SO ORDERED.


                                                        _____/s/_____
                                                        Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                March 5, 2021